IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMANDA F. LEVINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 12-1368 |
| v. ) | |
| ) | Judge Arthur J. Schwab |
| CAROLYN W. COLVIN, ) | Magistrate Judge Cynthia Reed Eddy |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, and grant Defendant's Motion for Summary Judgment.

### II. REPORT

**A. BACKGROUND**

**1. Procedural**

Amanda F. Levinson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). Plaintiff filed for benefits claiming an inability to work due to disability beginning January 21, 2000. (R. at 131 – 37).[1] At the time of her application for benefits, Plaintiff's allegedly disabling impairments

---

[1] Citations to ECF Nos. 5 – 5-8, the Record, *hereinafter*, "R. at __."

included bipolar disorder, anxiety, and other unspecified mental impairments which were responsible for difficulty concentrating and working with others. (R. at 145). Despite her claims, Plaintiff was denied benefits under the Act. (R. at 1 – 5, 12 – 29, 73 – 84). Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 8, 12).

**2. General**

Plaintiff was born on July 1, 1981, was twenty-seven years of age at the time of her application for benefits, and was twenty-nine years of age at the time of her administrative hearing. (R. at 35, 142). Plaintiff completed the tenth grade and had no post-secondary education or vocational training. (R. at 150). At the time of her hearing, Plaintiff was attempting to obtain her GED via online courses. (R. at 46). Plaintiff's work experience included a brief stint as a cashier at Wal-Mart, and employment by her disabled mother for the purpose of providing some unspecific degree of home care. (R. at 35 – 36). Plaintiff had two children, but did not have any contact with them. (R. at 35, 53, 164). She most recently resided independently in her own apartment. (R. at 34). She subsisted on welfare benefits, and received medical care through the state. (R. at 36).

**3. Treatment History**

Plaintiff appeared at Southwestern Pennsylvania Human Services ("SPHS") in Greensburg, Pennsylvania on January 8, 2009, seeking therapy and medication for mental health issues. (R. at 163 – 64). In an initial Psychosocial Evaluation, Plaintiff's complaints of daily mood swings, depression, anhedonia, over-sleeping, panic attacks, hallucinations, and passive suicidal ideation were recorded. (R. at 164). Plaintiff ascribed her mental decline to the birth of her first child, and claimed that the birth of her second child worsened her condition. (R. at 164).

Plaintiff was also noted to be a long-time alcohol and crack cocaine abuser. (R. at 164). Plaintiff had one hospitalization in the past for her mental health. (R. at 164). She alleged one prior attempted suicide. (R. at 164). Plaintiff was noted to be cooperative and motivated to improve. (R. at 163). Plaintiff was to be evaluated for potential bipolar disorder. (R. at 164). She was also to begin medication management, therapy, and abstinence from addictive substances. (R. at 164). In the past, she had improved with treatment. (R. at 163).

Plaintiff was assessed by a physician at SPHS on March 24, 2009. (R. at 165 – 69). Her initial complaints were again noted. (R. at 165 – 69). Plaintiff appeared mildly anxious, but had an appropriate, reactive affect. (R. at 168). Her speech was not pressured, her thought process was linear and goal oriented, she denied suicidal or homicidal ideation, there was no evidence of delusion or paranoia, she was alert and oriented, her memory and cognition were grossly intact, and her insight and judgment were fair; however, she claimed to hear her deceased father's voice. (R. at 168). Plaintiff was diagnosed with depressive disorder, agoraphobia, post-traumatic stress disorder, substance abuse, in remission, and potential cocaine induced mood disorder. (R. at 169). Plaintiff's global assessment of functioning[2] ("GAF") score was 52. (R. at 169).

Plaintiff was voluntarily admitted to the inpatient psychiatric unit of Westmoreland Hospital in Greensburg, Pennsylvania on December 7, 2009. (R. at 215 – 16). Plaintiff complained of depression and suicidal thoughts following the death of her mother. (R. at 215). Plaintiff had not taken her prescribed medications in two months. (R. at 215). Plaintiff had last

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

3

used crack cocaine on December 5, 2009. (R. at 215). Plaintiff was considered to be a danger to herself. (R. at 215). Plaintiff endorsed feelings of confusion, impaired attention, increased anxiety, decreased stress tolerance, decreased motivation, inability to engage in activities of daily living, and emotional trauma from three alleged past rapes at an unspecified time. (R. at 215).

Following discharge from the hospital, Plaintiff began treatment at Chestnut Ridge Counseling Services ("Chestnut Ridge") in Greensburg, Pennsylvania on December 10, 2009. (R. at 265 – 67). On her intake sheet, it was noted that Plaintiff suffered from depression, thought disorder, trauma as a result of three rapes between 2004 and 2006, anxiety, and crack cocaine addiction. (R. at 265 – 66). Plaintiff's GAF score was 57. (R. at 265). Plaintiff denied engaging in treatment for her substance abuse in the past. (R. at 267). She was to engage in medication management, as well as individual and group therapy. (R. at 265). Plaintiff was started on Seroquel and Prozac. (R. at 266). She was not believed to be a danger to herself or others. (R. at 267).

At an appointment at Chestnut Ridge on December 28, 2009, Plaintiff was noted to be compliant, she was alert and oriented, she had "o.k." mood, she had appropriate affect, she had good sleep, and she had a good appetite. (R. at 263). She was not believed to be a suicide/homicide risk. (R. at 263). Plaintiff was next seen on March 18, 2010. (R. at 261). She was observed to be anxious, frustrated, irritable, labile, and tearful. (R. at 261). However, she had not been experiencing panic attacks, she was pushing herself to do more chores around her home, she denied suicidal and homicidal ideation, she had no hallucinations or delusions, she was active with Alcoholics Anonymous/Narcotics Anonymous ("AA/NA"), she had allegedly remained sober for the past 103 days, and she exhibited fair insight and judgment. (R. at 261).

At an appointment at Chestnut Ridge on July 14, 2010, Plaintiff was observed to have a stable mood, appropriate affect, good sleep, adequate appetite, intact thought, and no suicidal or homicidal ideation. (R. at 258). Additionally, her memory was intact, her impulse control was fair, her insight and judgment were fair, and she continued to be active in AA/NA. (R. at 257). Plaintiff was stable on her medications, and was able to get a full night's sleep. (R. at 257). Plaintiff had a loss of medication coverage for slightly greater than two months, at which point her symptoms worsened somewhat. (R. at 257). At a regularly scheduled annual physical examination with her primary care physician on August 31, 2010, Plaintiff was noted to be alert, and her affect was noted to be normal. (R. at 224 – 25).

At Plaintiff's next appointment at Chestnut Ridge on November 10, 2010, she was noted to be "doing well." (R. at 256). She denied suicidal or homicidal ideation, hallucinations, and delusions, her insight and judgment were fair, she had remained abstinent from drugs and alcohol, and she denied feeling helpless. (R. at 256). She did express that her mood continued to fluctuate, and she experienced increased flashbacks of past trauma. (R. at 256).

### 4. Functional Capacity Evaluations

On June 10, 2009, Dennis W. Kreinbrook, Ph.D. completed a psychological evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 170 – 75). Plaintiff arrived for her examination with the help of a friend, was casually dressed, exhibited good hygiene, and was cooperative throughout the assessment process. (R. at 170). Plaintiff claimed that her mental issues began in early adolescence, and that there was a history of mental illness in her family. (R. at 170). Plaintiff described experiencing rapid mood cycling, hearing voices, suffering from paranoia, experiencing decreased sleep, and having difficulty with impulse control. (R. at 170 – 72). Plaintiff stated that she was currently prescribed Wellbutrin, Celexa,

5

and Abilify for treatment of diagnosed bipolar disorder. (R. at 171). Plaintiff claimed that she had no history of alcohol abuse, but that she did abuse crack cocaine. (R. at 171). Plaintiff denied suicidal and homicidal ideation. (R. at 171).

Dr. Kreinbrook observed Plaintiff to have normal psychomotor activity, normal speech, full range of affect, goal-directed and relevant thought, no language impairment, no phobias, average intellectual ability, below average concentration, limited immediate retention and recall, intact memory, below average social comprehension, and intact insight. (R. at 171 – 72). Dr. Kreinbrook felt that Plaintiff suffered from bipolar disorder. (R. at 172). Her GAF score was $50^3$. (R. at 172). In spite of her ability to cook, clean, and shop, Dr. Kreinbrook believed that Plaintiff was not capable of managing her own funds or her own residence. (R. at 172). She would have marked limitation with respect to understanding, remembering, and carrying out detailed instructions, interacting with co-workers and supervisors, responding appropriately to pressures in a usual work setting, and responding appropriately to changes in a routine work setting. (R. at 173 – 74). Dr. Kreinbrook opined that crack cocaine abuse contributed to her functional limitations. (R. at 175).

On June 23, 2009, state agency evaluator Ray M. Milke, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 176 – 79). Based upon his review of the medical record, he concluded that the evidence supported finding impairment in the way of affective disorders and substance addiction disorders. (R. at 176). As a result, Dr. Milke determined that Plaintiff would experience marked limitation with respect to understanding, remembering, and carrying out detailed instructions, interacting appropriately with the general public, maintaining socially appropriate behavior, and adhering to basic

---

[3] An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

6

standards of neatness and cleanliness. (R. at 176 – 77). Regardless, Dr. Milke believed that Plaintiff was capable of sustaining full-time employment. (R. at 178 – 79). Plaintiff had the ability to make simple decisions, she would not require special supervision in order to sustain a work routine, she could ask simple questions and accept instruction, she could exercise appropriate judgment, and she could perform jobs not involving complicated tasks. (R. at 178). Some weight was given to the findings of Dr. Kreinbrook. (R. at 179).

On August 31, 2010, Lindsey Groves, Psy.D., completed a consultative psychological evaluation of Plaintiff. (R. at 197 – 207). Plaintiff reported to Dr. Groves that she was bipolar and experienced anxiety and panic attacks. (R. at 197). Dr. Groves noted Plaintiff's diagnoses of depressed type bipolar disorder, specific phobia – other type, and cocaine abuse in early full remission (nine months). (R. at 197, 200). Plaintiff's GAF score was 55. (R. at 200). Following a December 2009 hospitalization for suicidal ideation, Plaintiff had been treated on an outpatient basis at Chestnut Ridge and SPHS. (R. at 198). Plaintiff claimed that her treatment had not improved her mental state. (R. at 198).

Dr. Groves observed Plaintiff to be pleasant and cooperative, and she had logical and organized thoughts with no deficits in memory; however, she had impaired insight and judgment. (R. at 201). Plaintiff denied feeling anxiety, unless she was in a car. (R. at 200). On a check-box form, Dr. Groves indicated that Plaintiff had appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, substance dependence, recurrent panic attacks, anhedonia, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal/isolation, blunt, flat, or inappropriate affect, decreased energy, manic syndrome, persistent irrational fears, and hostility and irritability. (R. at 200). Plaintiff also had extreme limitation with respect to activities of daily living, marked limitations in social functioning,

7

concentration, persistence, and pace, and poor/no ability to follow work rules, use judgment, deal with work stresses, understand, remember, and carry out detailed or complex job instructions, behave in an emotionally stable manner, and relate predictably in social situations. (R. at 203 – 206). Equivocally, Dr. Groves also indicated that Plaintiff had a fair ability to maintain attention and concentration, and poor memory. (R. at 200, 205).

Dr. Groves felt that Plaintiff's prognosis was guarded. (R. at 198). She considered Plaintiff to be eighty five percent disabled, and that she met the listing level requirements for affective disorder, anxiety-related disorder, and substance abuse, entitling Plaintiff to an automatic award of disability benefits. (R. at 199). Her conclusions were based solely upon Plaintiff's subjective claims, and not upon any tests or evaluations. (R. at 197, 202).

### 5. Administrative Hearing Testimony

Plaintiff testified that she last worked for her disabled mother, and helped her around the house. (R. at 35). Her mother paid her for her help. (R. at 35 – 36). Prior to that, Plaintiff was employed as a cashier for Wal-Mart. (R. at 36). Plaintiff left that job because, "I just got old with it," and she was no longer interested in working there. (R. at 36). In terms of daily activities, Plaintiff was capable of cleaning her apartment, and grocery shopping. (R. at 52). A typical day involved mostly watching television. (R. at 53). Plaintiff would attempt to watch movies or read, but was easily sidetracked. (R. at 53). Plaintiff would play on her computer, sent and received emails, and used Facebook. (R. at 54). She had a boyfriend who would regularly visit her. (R. at 55). She did not like to go out, even to her boyfriend's home. (R. at 55). Plaintiff had no hobbies or other activities that she enjoyed. (R. at 56).

Plaintiff regularly treated with a psychiatrist and therapist for her mental health issues. (R. at 38). Plaintiff had been prescribed Seroquel and Prozac. (R. at 42). She did not believe

8

that her medications helped her. (R. at 48). She did admit that medication treatment had helped her in the past, however. (R. at 56). Plaintiff faulted her current medications for a recent gain of approximately one hundred pounds in three months. (R. at 42).

Plaintiff claimed to begin experiencing depression and bipolar symptoms following the birth of her first child. (R. at 41). As a result, she did not "feel like doing anything," and slept "all the time." (R. at 41, 44). Plaintiff described voluntarily admitting herself to psychiatric inpatient treatment due to increased depression following her mother's death. (R. at 43). Plaintiff stated that she was suicidal and attempted to hurt herself. (R. at 43). She could not remember how she tried to hurt herself. (R. at 43). She claimed to have attempted self-injury in the past, as well. (R. at 43).

Plaintiff described having an irregular sleep schedule. (R. at 45). She slept one-and-one-half to three hours during the day, and four hours at night. (R. at 45). Her nighttime sleep was punctuated by nightmares and flashbacks related to three prior rapes. (R. at 45 – 46). Plaintiff's depression also affected her concentration and motivation. (R. at 46). She was attempting to obtain her GED through online courses, and had difficulty remembering subjects she studied. (R. at 46). Plaintiff's depression also alternated with brief manic periods. (R. at 49). Plaintiff stated that she occasionally had problems being around other people, and would experience panic attacks while in public. (R. at 47). Plaintiff was also scared to drive, and would experience panic while in a vehicle. (R. at 47).

Plaintiff testified regarding a history of drug and alcohol abuse. (R. at 50). She claimed to have maintained sobriety for the past three hundred and twenty-four days. (R. at 50). She no longer participated in AA/NA or drug treatment at SPHS. (R. at 50 – 51). She believed that she

could direct her own rehabilitation, and avoided people and places associated with her past substance abuse. (R. at 52).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical individual of Plaintiff's age, educational background, and work experience would be eligible for employment in a significant number of jobs in existence in the national economy if limited to work involving only simple, routine, tasks, no more than simple, short instructions, simple work-related decisions, few workplace changes, no fast-paced production pace work, assembly line work, or a fast-paced work environments, no interaction with the public, no more than occasional interaction with co-workers or supervisors, and no exposure to dangerous machinery or unprotected heights. (R. at 59). In response, the vocational expert explained that such a person would be capable of obtaining employment as a "box bender," with 475,000 positions available in the national economy, as a "garment sorter," with 1.4 million positions available, or as a "nut sorter," with 435,000 positions available. (R. at 60).

The ALJ followed by asking whether jobs would still be available if the hypothetical individual would need to take rest breaks outside those customarily provided by an employer, or would need to lie down between one and three hours on any given work day. (R. at 60). The vocational expert replied that such a person would not be able to work full-time. (R. at 60). The vocational expert also stated that a person who would be off-task at work for more than fifteen percent of any given work day would not be able to sustain full-time employment. (R. at 61). Such a person could also miss no more than one day of work, per month, on a regular basis. (R. at 62).

Plaintiff's attorney then asked whether a person without the ability to complete a task from beginning to end would be able to work a full-time job. (R. at 62). The vocational expert

said that no jobs would be available to such a person. (R. at 62). Plaintiff's attorney then asked whether a hypothetical individual could maintain a full-time position if he or she had no ability to deal with work stresses. (R. at 63). The vocational expert believed that such a person would not be able to work full-time. (R. at 63).

**B. ANALYSIS**

**1. Standard of Review**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas,* 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## 2. Discussion

In his decision, the ALJ found that Plaintiff experienced medically determinable severe impairment in the way of bipolar I disorder, panic disorder, and crack cocaine abuse in early remission. (R. at 17). The ALJ found that during her time abusing drugs and alcohol, Plaintiff was disabled from working. (R. at 19). However, when she abstained from drug and alcohol abuse ("DAA"), she was capable of a full range of exertional work not involving exposure to unprotected heights or dangerous machinery, more than simple, routine tasks, more than simple, short instructions and simple work-related decisions, more than a few workplace changes, production-rate pace, or interaction with the public, or more than occasional interaction with co-workers and supervisors. (R. at 21). Based upon the testimony of the vocational expert, full-time work accommodating said limitations existed in significant numbers in the national economy. (R. at 21). As a result, the ALJ concluded that without DAA, Plaintiff was not disabled, and was not, therefore, entitled to disability benefits. (R. at 25 – 26).

Plaintiff objects to this decision by the ALJ, arguing that he erred in finding that absent DAA, Plaintiff was not disabled, by failing to discuss a diagnosis of personality disorder, by

13

failing to discuss Plaintiff's eligibility for disability under Listing 12.08 (Personality disorder), and by failing to give full weight to all the limitations findings made by Drs. Kreinbrook and Milke. (ECF No. 9 at 11 – 17). Defendant counters that the ALJ adequately supported his decision with substantial evidence from the record, and should be affirmed. (ECF no. 13 at 11 – 18). The Court agrees with Defendant.

Plaintiff begins by arguing that those limitations attributable to DAA as opposed to Plaintiff's other mental impairments, were not adequately delineated, and that the ALJ had no basis for determining that, without DAA, she would be able to engage in substantial gainful activity. (ECF No. 9 at 12 – 13). Additionally, Plaintiff claims that her "over one and one-half years" of sobriety at the time of the ALJ's decision demonstrated that she still exhibited significant dysfunction after DAA ceased. (*Id.*). The Court finds this argument to be unavailing.

With respect to DAA, the Act states that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 428 (W.D. Pa. 2010) (quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)). According to 20 C.F.R. §§ 404.1535 and 416.935, the 'key factor' in making the above conclusion is determining whether a claimant would continue to be disabled if they ceased to use drugs and/ or alcohol. *See also Nomes v. Astrue*, 155 Soc. Sec. Rep. Serv. 860, 2010 WL 3155507 at * 7 – 8 (W.D. Pa. 2010) (quoting *Warren v. Barnhart*, 2005 WL 1491012 at *10 (E.D. Pa. 2005)). Side effects of drug and alcohol abuse, and any impact on other existing impairments, must be isolated so that the remaining limitations may be assessed. EM-96200 at q. 25 – 28. It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work, and if it is not possible to distinguish between the limitations created by DAA or the

14

claimant's other impairments, to find that DAA is not a contributing factor material to disability. *Id.* A "materiality finding must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." *Ambrosini*, 727 F. Supp. 2d at 430 (citing *Sklenar v. Barnhart*, 195 F. Supp. 2d 696, 699 – 706 (W.D. Pa. 2002)). The ALJ met his burden, here.

The ALJ conducted a bifurcated analysis, as required. He determined that Plaintiff would be disabled under the Act at Step 3, concluding that as a result of DAA, Plaintiff met the listing requirements under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.09 (Substance Addiction Disorders). (R. at 18 – 19). In coming to this decision, the ALJ relied primarily upon the findings within Dr. Kreinbrook and Dr. Milke's June 2009 assessments. (R. at 18 – 19). The ALJ noted that Dr. Kreinbrook believed that Plaintiff's DAA contributed to her functional limitation. (R. at 19).

In the record, Plaintiff's last use of crack cocaine was on December 5, 2009, just prior to her hospitalization. (R. at 215). Following that time, medical notes from Plaintiff's treating sources generally indicated that Plaintiff was capable of living alone, caring for personal needs, cleaning, cooking, shopping, traveling in a car with others, and using a computer. (R. at 20). She maintained a relationship with a boyfriend and attended AA/NA meetings. (R. at 20). Her concentration, persistence, and pace were generally not indicated to be severely affected. (R. at 20). Plaintiff had experienced no episodes of decompensation of extended duration. (R. at 20). Moreover, her treating medical sources indicated ongoing improvement after her release from the hospital and abstinence from DAA. (R. at 22). Her GAF scores were in the moderate range of limitation, her mood stabilized, her sleep improved, her affect was appropriate, her appetite

was adequate, her thought processes were intact, her anxiety decreased, and Plaintiff denied panic attacks, paranoia, obsessions, compulsions, mania, and hallucinations. (R. at 22 – 23).

Based upon these objective medical observations contained within Plaintiff's treatment notes, the ALJ found that Plaintiff no longer met the requirements for the above listings. (R. at 19 – 24). He then formulated a hypothetical and RFC assessment, and determined that in the absence of DAA, Plaintiff's limitations were not significant enough to preclude her from all full-time work. (R. at 21 – 25). As a result, he decided that Plaintiff's DAA was material to a finding of disability, and that Plaintiff was not entitled to benefits. The ALJ completed the proper analyses, as required, and bolstered his decision with substantial evidence from the record. Plaintiff has put forth no evidence which undermines the ALJ's conclusions.

Plaintiff next argues that her limitations were not all adequately accommodated in the ALJ's hypothetical and RFC assessment. (ECF No. 9 at 16 – 17). In terms of the more extreme limitations findings made by the consultative and state agency physicians, as noted by the ALJ, Dr. Groves' more severe findings were unsupported by Plaintiff's treatment record, except during periods of DAA or lack of medication. (R. at 23 – 24). Further, Dr. Kreinbrook and Dr. Milke's more severe limitations findings were made while Plaintiff was involved with DAA and not consistently on prescription medications. (R. at 22 – 24). A physician's opinion "does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a physician's opinion outright, or accord it less weight. *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008). Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer v. Apfel*, 186 F. 3d 422, 430

16

(3d Cir. 1999) (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)). Treatment notes from both SPHS and Chestnut Ridge largely confirmed the ALJ's conclusions. As such, the ALJ's decision was supported by substantial evidence.

Lastly, Plaintiff argues that the one-time diagnosis of personality disorder, NOS, by psychiatrist Padmaja Chilakapati, M.D. deserved greater consideration at all steps of the ALJ's analysis. (ECF No. 9 at 13 – 16). This assertion is without merit. Plaintiff's argument is unaccompanied by any objective evidence from the record with respect to the nature of Plaintiff's personality disorder or any functional limitations which may or may not attach to it. Plaintiff's cites to no discussion of this particular diagnosis by any other treating source on the record. "A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act. Rather, a claimant must show that the impairment resulted in disabling limitations." *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (citing *Petition of Sullivan*, 904 F. 2d 826, 845 (3d Cir. 1990)). Plaintiff did not specify how the personality disorder diagnosis further impaired her ability to work, beyond mere speculation. This sort of generalized response is not adequate to remand for explicit discussion of personality disorder when there is no evidence that it would affect the outcome of the case. *Rutherford v. Barnhart*, 399 F. 3d 546, 553 (3d Cir. 2005). The ALJ's lack of discussion regarding personality disorder does not necessitate remand, here.

C. CONCLUSION

The Court finds that the ALJ provided substantial evidence for his determination that Plaintiff's DAA was material to her disability, and that without it she would be capable of engaging in a significant number of occupations available in the national economy. Based upon the foregoing, the Court respectfully recommends that Plaintiff's Motion for Summary Judgment

be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

*s/ Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge

August 1, 2013
cc/ecf: All counsel of record.